684 So.2d 315 (1996)
Ronald WINSTON, as Personal Representative and former Co-Guardian of the Estate of Edna Vivian Winston, Deceased, Appellant,
v.
Bruce WINSTON, Appellee.
No. 95-2276.
District Court of Appeal of Florida, Fourth District.
December 18, 1996.
*316 Arthur J. England, Jr., John G. Crabtree of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, for appellant.
Samuel S. Smith of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, and Edward H. Wohl of Wohl & Entwistle, New York, NY, for appellee.
PARIENTE, Judge.
Appellant, Ronald Winston (Ronald), appeals a final order which vacated a prior order transferring assets from a guardianship to a marital trust. Because the conduct complained of does not constitute extrinsic fraud as a matter of law, the trial court erred in vacating the order more than one year after its entry.
Ronald and appellee, Bruce Winston (Bruce), were the sons of Harry Winston and Edna Winston. Both Harry and Edna died testate; Harry in 1978, and Edna in 1986. Ronald and Bruce were the sole heirs to the multi-million dollar fortune of Harry Winston, owner of the world-famous family jewelry business, Harry Winston, Inc. Ronald and Bruce were also the sole heirs of Edna's residuary estate, which consisted of her entire probate estate except for the bequest of a life estate in her jewelry.
While both sons inherited under the wills of both their father and mother, the terms of inheritance varied. Under their mother's will, each son received equal treatmentfifty percent of her residuary estate outright. Their father's will created a marital trust which provided that after his wife's death, the marital trust would be equally divided between Ronald and Bruce. Whereas Ronald was to receive his fifty percent share outright, Bruce was to receive his fifty percent share in trust with the corpus to be paid out in five-year installments over a twenty-five year period.
The trustees of the marital trust had sole discretion to disburse additional funds to Bruce from the principal if "appropriate for his support and welfare." If Bruce were to die within the twenty-five years following Edna's death without issue surviving him, Ronald would receive the remaining assets of the trust outright. Ronald was one of the trust's three trustees and was authorized to cast the deciding vote in a dispute between the two other trustees.
Edna became incompetent after executing the will. In 1979, with their father deceased, Ronald and Bruce petitioned for and were granted appointment as co-conservators for their mother in New York. Later that year, Ronald and Bruce received authorization from the New York court to relocate their mother to Florida for health reasons. A guardianship was established in Florida, with Ronald and Bruce appointed co-guardians by the Broward County Circuit Court, probate division (probate court), upon their joint petition.
The court proceeding critical to this appeal occurred in 1983, when Ronald and Bruce jointly petitioned the probate court for approval to transfer all of Edna's liquid assets to the marital trust created by Harry's will. According to Ronald, the petition to transfer was filed as a result of sophisticated tax and estate planning strategy recommended by a cadre of tax and estate attorneys. Ronald asserts that the transfer was recommended to prevent Edna's estate from being consumed in the payment of taxes because of particular provisions in the testamentary documents.
Before approving the transfer of Edna's separate assets to the marital trust, the probate court required sworn verifications to the petition from Ronald and Bruce as co-guardians. It also required the filing of certain exhibits to the petition, including copies of both wills. After Edna's death in 1986, Ronald and Bruce as co-guardians submitted a *317 final accounting. The guardianship was subsequently closed.
In 1991, eight years after Bruce had joined in petitioning for approval of the transfer, and five years after the guardianship was closed, Bruce petitioned the probate court to reopen the closed guardianship proceeding. Bruce also initiated a separate lawsuit to invalidate the 1983 transfer order, claiming that he had been the victim of extrinsic fraud. Bruce contended that Ronald had defrauded him and the probate court by concealing Ronald's true purpose for the transfer, which Bruce asserted was to prevent him from receiving his share of Edna's assets outright. Bruce stated that he had not understood that the transferred assets would be held in trust for him rather than disbursed to him outright upon his mother's death.
Both proceedings were consolidated and, following a non-jury trial, the trial court vacated the 1983 order of transfer. The trial court found that the petition and its attachments "so misled the Court and plaintiff regarding the effect of the transfer that Bruce Winston had no reason to act to protect his rights as against his brother and co-guardian Ronald Winston."[1] The trial court specifically found that one attachment to the petition, referred to as the "New York Petition," "advised the Court and Bruce Winston that the testamentary provisions were the same" and the transfer revocable.[2]
The trial court found not only misrepresentations in the documents presented to the probate court, but "concealment of the true facts." It referred to a letter written to Ronald by an attorney which advised Ronald that "[c]onceptually [the transfer] might present a problem for Bruce because his interest in the trust does not entitle him to corpus (except for periodic payments over 20[sic] years), whereas his interest in Mrs. Winston's residue comes to him outright." Bruce never received a copy of this letter.
The trial court rejected Ronald's argument that no fraud on his part had been established. In rejecting Ronald's alternate argument that if any fraud had been involved, it was intrinsic, the trial court found:
While there may have been intrinsic fraud involved in this case, this Court makes no finding as to the existence of intrinsic fraud. What this Court does find, and finds most disturbing, is the collateral fraud, consisting of the acts and omissions of Ronald Winston, which fraud was calculated to prevent Bruce Winston from ever presenting his case regarding the effect of the transfer of the cash and investment assets to the marital trust under the Will of Harry Winston. Specifically, the extrinsic fraud was effectuated through a series of letters and memos, together with the New York Petition, followed by the filing of the Florida Petition, all of which effectively prevented Bruce Winston from objecting to a plan that resulted in the assets of his mother's estate being held in trust for him, rather than being distributed outright to him....
The trial court found that as a result of the fraud practiced upon Bruce, the probate court never addressed the "issue of the distribution of Edna Winston's cash and investment assets." Implicit in the trial court's findings is that if Bruce had known the true facts, he would have opposed the transfer, thus giving the probate court an opportunity to question the propriety of the transfer.[3] In vacating the 1983 order, the trial court also ordered Ronald to seek a return of all assets transferred together with all earnings thereon.
We focus on the legal issue of whether the conduct complained of constitutes *318 extrinsic fraud, because if it does not, then the proceedings were time-barred. Rule of Civil Procedure 1.540(b) imposes a one-year time limitation on motions to vacate based upon fraud; however, the one-year time bar does not apply to extrinsic fraud, which is referred to as "fraud upon the court."[4]See DeClaire v. Yohanan, 453 So.2d 375, 378 (Fla.1984); Fritsevich v. Estate of Voss, 590 So.2d 1057, 1058 (Fla. 3d DCA 1991) (probate court not precluded in proper case from relieving party from final judgment or order under rule 1.540, upon grounds and within time limits set forth therein).
In DeClaire, our supreme court set forth the essential distinctions between extrinsic and intrinsic fraud, defining extrinsic fraud very narrowly. Extrinsic fraud involves conduct which is collateral to the issues tried in a case. DeClaire, 453 So.2d at 377. "[E]xtrinsic fraud occurs where a defendant has somehow been prevented from participating in a cause." Id. "Intrinsic fraud, on the other hand, applies to fraudulent conduct that arises within a proceeding and pertains to the issues in the case that have been tried or could have been tried." Id.
In DeClaire, the former wife attempted to set aside a final judgment of dissolution based upon the husband's fraudulent misrepresentations of his net worth as contained in a financial affidavit submitted to the court. The former wife alleged that the husband's fraudulent affidavit constituted fraud on the court, permitting the judgment to be set aside more than one year later. Id. at 376.
Because the false financial affidavit submitted by the husband was part of the record and constituted a matter before the court for resolution, our supreme court found the conduct to be intrinsic fraud, not extrinsic fraud. As intrinsic fraud, the filing of the false affidavit would not be deemed "fraud on the court," even though the improper conduct of filing a blatantly false financial affidavit with the court might constitute perjury.[5]Id. at 380.
Recently, our supreme court reaffirmed the principles of DeClaire in Cerniglia v. Cerniglia, 679 So.2d 1160 (Fla.1996). In Cerniglia, the former wife alleged that the marital settlement agreement had been obtained by duress, coercion, and threats; that she had been enticed to enter the agreement by oral promises to pay her additional sums; and that the former husband had failed to make full financial disclosure. Id. at 1162. In applying the DeClaire standard, our supreme court concluded that the wife's allegations of coercion, duress, enticement, and fraudulent financial disclosure constituted intrinsic, not extrinsic, fraud. Id. at 1163. In so holding, our supreme court disapproved this court's holding in Lamb v. Leiter, 603 So.2d 632 (Fla. 4th DCA 1992), one of the opinions on which the trial court relied in finding extrinsic fraud in this case. See Cerniglia, 679 So.2d at 1164.
In Cerniglia, as in DeClaire, "[t]he parties' voluntary assent to the marital property settlement agreement was ... `an issue before [the] court for resolution and the complaining party could have addressed the issue in the proceeding.'" Id. at 1163 (citing DeClaire, 453 So.2d at 380). Expanding the definition of fraud on the court to include claims of duress, coercion, and deceit would "negatively impact the finality of judgments.... [S]uch an expansion ... is contrary to the public policy favoring the termination of litigation after trial and appeal of the court's judgment." Id. at 1164.
Our supreme court applied the principles of DeClaire to probate proceedings in Arrieta-Gimenez v. Arrieta-Negron, 551 So.2d 1184 (Fla.1989). The parties, five children of the decedent, reached a property settlement which resolved a dispute over the division of their late father's estate. Id. at 1185. The appellant, one of the children, accepted the *319 offer, and the settlement was reduced to a consent judgment. Three years after the consent judgment, the appellant discovered that she had been misled about the extent of her father's holdings in Puerto Rico and attempted to set aside the settlement. Id.
After examining the record, our supreme court found that the complained-of conduct, if proven, was the type considered to be intrinsic fraud. Id. Our supreme court disagreed that the alleged misrepresentation amounted to "extrinsic fraud that deprived appellant of the opportunity to present her case in court." Id. at 1186. The appellant had "every right to reject the settlement offer until she could adequately explore the extent of her father's holdings in Puerto Rico." 551 So.2d at 1186.
The critical inquiry here is whether the conduct complained of arose in connection with a matter presented to the probate court in a proceeding where the complaining party participated. The issue presented to the probate court was the approval of the transfer of Edna's liquid assets. Applying DeClaire to the facts of this case, we find no extrinsic fraud as a matter of law because the conduct complained of arose in connection with the very documents submitted to the probate court for its approval.
Where a claim of fraud rests on the contention that a party has been misled as to the meaning or effect of documents actually presented to the court, the claim rests on intrinsic fraud. This is so even though some of the allegedly fraudulent or deceitful acts or omissions may have occurred extrajudicially. See Cerniglia.
Regardless of whether either Bruce or the probate court believed the transfer to be revocable after Edna's death or believed the provisions of the marital trust identical to Edna's will, Bruce voluntarily signed the documents under oath requesting the transfer.[6] In so doing, he participated in the very proceeding of which he now complains.
Bruce also urges that we create an exception to the rule limiting untimely attacks on judgments for probate and guardianship proceedings because the very nature of these proceedings is non-adversarial. This alternate argument parallels the appellant's argument in Arrieta. The appellant there argued that because a consent judgment was involved, there were no "proceedings" conducted before the court during which the fraud could have arisen; she had been fraudulently induced to accept the settlement offer without a trial of the issues. Arrieta, 551 So.2d at 1186.
Our supreme court rejected the argument that because the fraud arose in connection with a consent judgment rather than an issue litigated or presented to the court, the rule limiting untimely attacks on judgments to cases involving fraud on the court should not apply:
The consent judgment in question stems from an order issued by a court of competent jurisdiction approving and confirming the settlement agreement entered into by the parties. While it is true, as appellant argues, that a consent judgment is a judicially approved contract, and not a judgment entered after litigation, it is a judgment nonetheless. As such, it is entitled to the same preclusive, res judicata effect as any other judgment issued by a Florida court. To hold otherwise would be contrary to our stated public policy of ensuring the finality of judgments.
Id.
We discern no compelling public policy reason why the principles underlying finality of judgments should not apply in this case. Similar to Arrieta, Bruce complains that he was fraudulently induced to sign the petition to transfer and that he was misled as to its effect. As in Arrieta, Bruce had every right to refuse to sign the petition until he had independently verified whether the transfer had any potentially adverse effect on his own inheritance rights. Even if the petition itself was misleading in leaving the impression that the terms of Edna's will and the trust provisions of Harry's will were identical, the actual *320 wills were available for Bruce and the probate court to compare as they were exhibits filed with the probate court. See Ginsberg v. Lennar Florida Holdings, 645 So.2d 490, 494 (Fla. 3d DCA 1994), review denied, 659 So.2d 272 (Fla.1995).
Bruce was neither incompetent nor incapacitated. He may have been less interested or savvy than Ronald; he may have trusted his older brother to act in his best interests.[7] But Bruce was his mother's co-guardian and thus had equal responsibility for the guardianship assets. Bruce received $250,000 in payment for his services when the guardianship was closedan equal amount to Ronald. There is no evidence that Ronald made any misrepresentations to Bruce, denied him access to any information, or prevented him from obtaining independent legal counsel.
By our reversal, we neither condone nor condemn Ronald's actions. Ronald urges us to exonerate him and find no fraud existed as a matter of law, but it is unnecessary for the resolution of this appeal to reweigh the evidence to determine whether Ronald acted as the concerned, dutiful son and brother with intent to maximize the tax benefits for both his brother and himself or as a knave and scoundrel with intent to dupe Bruce and maximize his parents' legacies for himself. We reverse because, as a matter of law, no extrinsic fraud has been demonstrated even when viewing Bruce's allegations, the evidence in support of the allegations, and the trial court's factual resolution in the light most favorable to Bruce.
REVERSED AND REMANDED WITH DIRECTIONS TO VACATE THE COURT'S ORDER AND TO ENTER JUDGMENT IN FAVOR OF APPELLANT.
STONE and FARMER, JJ., concur.
NOTES
[1] The probate judge who signed the 1983 order was the same judge who presided over the trial of this cause.
[2] Prior to filing the petition in Florida, a petition to make a "revocable transfer" of assets had been filed in New York by Ronald and Bruce and approved by the New York court. The New York lawyer who prepared that petition testified that he understood the transfer to be completely revocable.
[3] Neither the trial court nor Bruce suggests that the inter vivos transfer had any adverse effect on Ednaother than to frustrate her testamentary intent to treat her sons equally by distributing her residuary estate to her sons outright upon her death.
[4] The lawsuit to revoke the 1983 transfer would be separately barred by the one-year statute of limitations contained in section 774.531, Florida Statutes (1985), or the four-year statute of limitations for lawsuits based on fraud.
[5] Subsequent to the DeClaire decision, an exception to the rule 1.540(b) one-year time limitation became effective with respect to fraud in financial affidavits in marital cases. See Fla. Fam. L.R.P. 12.540; In re Family Law Rules of Procedure, 663 So.2d 1049 (Fla.1995).
[6] The petition on its face stated that the transfer would become irrevocable on Edna's death. As to the statement concerning identical testamentary provisions, Ronald asserts that this refers to the identity of the named beneficiaries. He also points out that the actual wills were available and in the record.
[7] Ronald was a Harvard graduate who headed Harry Winston, Inc. after his father's death. Bruce graduated from high school, but did not complete college or become involved in the family business.